829 A.2d 1106 (2003)
362 N.J. Super. 572
STATE of New Jersey, Plaintiff-Respondent,
v.
Allen MAY, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 21, 2003.
Decided August 18, 2003.
*1108 Brian Zavin, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Zavin, of counsel and on the brief).
Boris Moczula, Assistant Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Arthur S. Safir, Deputy Attorney General, of counsel and on the brief).
Before Judges KESTIN, FALL and WEISSBARD.
*1107 The opinion of the court was delivered by KESTIN, P.J.A.D.
Defendant was charged with two counts of endangering the welfare of a child: the second-degree crime established in N.J.S.A. 2C:24-4b(5)(a) for his alleged receipt and subsequent distribution of child pornography, and the fourth-degree crime established in N.J.S.A. 2C:24-4b(5)(b) for his alleged possession of child pornography. After a jury trial, defendant was convicted of both charges. The trial court merged the convictions, and sentenced defendant to a five-year term of imprisonment followed by sex offender registration pursuant to N.J.S.A. 2C:7-1 to -19. Appropriate statutory fees, penalties and assessments were also ordered.
On appeal, defendant raises the following issues:
POINT I BECAUSE IT PROHIBITS A SUBSTANTIAL AMOUNT OF PROTECTED SPEECH, N.J.S.A. 2C:24-4b IS UNCONSTITUTIONALLY OVERBROAD IN VIOLATION OF THE FIRST AMENDMENT.
POINT II BECAUSE THE STATE'S OWN EXPERTS COULD NOT ASCERTAIN WHETHER THE IMAGES OF CHILDREN IN *1109 THIS CASE WERE COMPUTERGENERATED OR ACTUAL PHOTOGRAPHS, DEFENDANT IS ENTITLED TO A JUDGMENT OF ACQUITTAL UNDER ASHCROFT V. FREE SPEECH COALITION.
POINT III BY PERMITTING THE STATE TO PROVE THAT A PERSON DEPICTED IN AN IMAGE WAS A CHILD WITHOUT SUBMITTING EVIDENCE OF ACTUAL AGE, N.J.S.A. 2C:24-4b(6) UNCONSTITUTIONALLY SHIFTS THE BURDEN TO DEFENDANTS TO PROVE THAT THE MATERIALS THEY POSSESSED DO NOT DEPICT CHILDREN.
POINT IV THE DELAY OF MORE THAN TWO AND ONE-HALF YEARS IN BRINGING DEFENDANT TO TRIAL DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL.
POINT V THE TRIAL COURT ERRED IN REFUSING TO DOWNGRADE DEFENDANT'S OFFENSE TO THE THIRD DEGREE FOR SENTENCING PURPOSES.
POINT VI BECAUSE THE OFFENSES WHICH DEFENDANT WAS CONVICTED OF DO NOT FALL WITHIN THE PURVIEW OF MEGAN'S LAW, N.J.S.A. 2C:7-2b(2), THAT PORTION OF HIS SENTENCE REQUIRING HIM TO REGISTER AS A SEX OFFENDER IS ILLEGAL AND MUST BE VACATED. (Not Raised Below)
The terms of the pertinent provisions of N.J.S.A. 2C:24-4b in effect at the times charged in the indictment, June 1, 1998 to October 27, 1998, are in the unemphasized portions of the following excerpt. The emphasized language was added to the statute by L. 1998, c. 126, effective May 1, 1999.
(5)(a) Any person who knowingly receives for the purpose of selling or who knowingly sells, procures, manufactures, gives, provides, lends, trades, mails, delivers, transfers, publishes, distributes, circulates, disseminates, presents, exhibits, advertises, offers or agrees to offer, through any means, including the Internet, any photograph, film, videotape, computer program or file, video game or any other reproduction or reconstruction which depicts a child engaging in a prohibited sexual act or in the simulation of such an act, is guilty of a crime of the second degree.
(b) Any person who knowingly possesses or knowingly views any photograph, film, videotape, computer program or file, video game or any other reproduction or reconstruction which depicts a child engaging in a prohibited sexual act or in the simulation of such an act, including on the Internet, is guilty of a crime of the fourth degree.
(6) For purposes of this subsection, a person who is depicted as or presents the appearance of being under the age of 16 in any photograph, [or] film, videotape, computer program or file, video game or any other reproduction or reconstruction shall be rebuttably presumed to be under the age of 16. If the child who is depicted as engaging in, or who is caused to engage in, a prohibited sexual act or simulation of a prohibited sexual act is under the age of 16, the actor shall be strictly liable and it shall not be a defense that the actor did not know that the child was under the age of 16, nor shall it be a defense that the actor believed that the child was 16 years of age or older, even if such a mistaken belief was reasonable.

No argument defendant raises concerning the meaning and application of the amendments themselves has bearing upon the *1110 questions presently before us. The amendments have no impact upon our understanding of how the pre-amendment provisions apply to the case at hand. See State v. Sisler, 177 N.J. 199, 827 A.2d 274 (2003); State v. Brady, 332 N.J.Super. 445, 753 A.2d 1175 (App.Div.), certif. denied, 165 N.J. 606, 762 A.2d 220 (2000).
The factual bases of the charges were that defendant had distributed and possessed child pornography he posted to and received from the Internet on his home computer. Among the defenses at trial was the contention that the images were not of actual children, but rather of dolls and virtual, computer-drawn-and-created images of children. In advancing that argument, defendant relied on Free Speech Coalition v. Reno, 198 F.3d 1083 (9th Cir. 1999). That decision has since been affirmed sub nom. Ashcroft v. Free Speech Coalition, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002), in which the United States Supreme Court determined that certain definitional sections of the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C.A. § 2251 to § 2260, to the extent they criminalized the possession or distribution of virtual images, were overly broad in their abridgements of freedoms protected by the First Amendment to the United States Constitution and, hence, unconstitutional. The Court reasoned that the governmental interest in protecting children did not extend to the use of images in the production of which real children had not been involved. The Court did not consider issues bearing on the process known as "computer morphing," i.e., "alter[ing] innocent pictures of real children so that the children appear to be engaged in sexual activity." 535 U.S. at___, 122 S.Ct. at 1397, 152 L.Ed.2d at 416.
The primary questions before us are whether N.J.S.A. 2C:24-4b is unconstitutional in whole or in part and, if the statute survives constitutional scrutiny, whether the trial court committed reversible error when it instructed the jury relative to what may be termed defendant's virtual-image defense that, because the State alleged the images possessed and distributed by defendant were of real children, the issue of whether N.J.S.A. 2C:24-4b(5) is violated by possession and distribution of virtual images of children was not before the jury. We are also called upon to determine whether the trial court erred when it: (1) denied defendant's motion for acquittal at the close of the State's case, (2) assertedly shifted to defendant the burden of proving the age of the persons depicted in the images obtained from his computer, (3) denied defendant's motion to dismiss the indictment based on the alleged violation of his right to a speedy trial, (4) denied defendant's request to be sentenced as a third-degree offender, rather than as a second-degree offender; and (5) ordered compliance with sex offender registration laws.

I
There is no essential factual dispute. In June and July 1998, the New York State Attorney General's Office investigated the dissemination of child pornography over the Internet. The investigation centered on "news groups," which are Internet sites devoted to specific topics and which were described at trial as functioning "[m]uch like the bulletin board at your local supermarket." News groups allow a person to post messages and files on a site for other persons to read, and they allow a person to read and download messages and files posted on the site by other persons. The New York authorities were mainly interested in the news-group site designated as "alt.binaries.pictures.erotica.preteen."
Monitoring that site, the New York authorities determined that a news-group user who identified himself as "mrperfect@bigfoot.com" made postings to the *1111 site on June 16, July 2, and July 5, 1998. The postings contained many images that could be characterized as child pornography. The New York authorities traced the postings to their origin, determining that they had come from defendant's home computer in New Jersey. At that point, the New York authorities referred the matter to the New Jersey State Police.
On October 27, 1998, representatives from various law enforcement organizations executed a warrant to search defendant's home in Bridgewater, seizing defendant's computer and other equipment, including floppy disks, that were in the room with the computer. Defendant's pre-trial motion to suppress this evidence was denied. That denial is not in issue on appeal.
The computer's hard drives and the floppy disks were subsequently examined by Detective Peter J. Wolf of the New Jersey State Police Division's High Technologies and Computer Vehicles Support Unit. Wolf testified for the State as an expert in "computer forensics," which involves the "technical aspects of computer analysis."
Wolf determined that the matter inspected contained about 959 "image files." Of those, Wolf determined that approximately 300 files pertained to the childpornography investigation because he "believed that they contain[ed] children in sexually explicit poses or in sexual activities." At trial, the State introduced fiftyeight of those image files into evidence against defendant.
The trial judge precluded the prosecutor from eliciting on direct examination Wolf's opinion about the ages of the persons depicted in the fifty-eight images presented to the jury. The court instructed the jurors that Wolf had not been qualified as an expert for the purpose of determining age and that the jury had to make its own determination about the ages of the persons in the images. On cross-examination, Wolf testified that he had no "factual knowledge" concerning the age or identity of the persons depicted in the fifty-eight images, and, on redirect examination, he stated that it "really takes an expert, usually a pediatrician," to make such a determination of age.
Wolf testified on direct examination that one of the images in evidence appeared to be a "morphed photograph," which is an image made when one "take[s] two photographs, maybe one of an adult and one of a child, and take[s] the child's head and put[s] it on the adult body or rearrange[s] it in any way you want to arrange it." On cross-examination, Wolf acknowledged that, through computer "morphing," it was possible to "take a picture of an adult and cause that picture to change into the same recognizable face, but with a younger look to it[.]" Wolf conceded that, by employing computer-morphing software, it would be possible to take a picture of him, an adult, and transform it "into a picture of ... a four foot tall little boy, but recognizable" as him. Wolf also agreed that morphing is "a process of transforming an image into something that it never was."
Wolf was then asked whether it was "possible in your opinion" that some or all of the fifty-eight images "of the young people" presented to the jury "might have been morphed images." Wolf testified that it was "possible," but that he did not believe most of the images depicted were morphed.
Wolf replied in the affirmative that it was "possible to create an image entirely on the computer." He also conceded the possibility that all fifty-eight of the images before the jury could have been "computer generated," but he rejected the premise that a particular image was a "doll," stating that the image looked "very real" to him. On redirect examination, Wolf clarified that his opinion of the image as that of *1112 a real "human being" and not a "doll" was based on the "shading" of the image and the "expressions on the child's face." On recross-examination, Wolf explained the term "computer generated" by agreeing with the following questions: "If an image is computer generated, then there is no child involved, no actual child involved? Correct? No actual child was photographed?" Wolf stated further, though, that a "child may have been used as a model" for the computer-generated image.
Wolf was also asked on redirect examination about morphed images among the fifty-eight images presented to the jury, and he repeated that "some of them, I believe[ ], were morphed ... but the majority of them I do not believe were morphed." He stated here, too, that this opinion was based on the lack of distortion in image shading, facial expressions, and body position that is common in morphed images.
On recross-examination, Wolf agreed there was "another way that images of people can get onto a computer, and that is called computer generation[,]". and he conceded he was not "prepared to say that none of the images in evidence could have been computer generated." Wolf also acknowledged that he could not make a distinction between an image that is "of an actual child or ... is a computer-generated image." He disclaimed any ability to "tell whether an image is ... a photograph of an actual person or a computer-generated image."
The State also offered testimony from James Domres of the New York State Attorney General's Office, who was qualified as an expert "in computer and interrelated Internet-related crimes, investigation and forensics." Domres testified that, although he made the initial determination that the Internet website files posted by defendant contained child pornography, he had no knowledge of the identity of the "young persons in those image files" or of their actual ages. Domres testified, as well, that he had made no determination whether the image files were "actual photographs" or "computer-generated images."
Defendant, appearing pro se at trial, testified on his own behalf. He stated that he visited the alt.binaries.pictures.erotica.preteen website and downloaded image files, but, in his opinion, the images were of young adults, not younger teenagers and definitely not children. According to defendant, if there had been any question in his mind concerning whether a particular image contained child pornography, he segregated that image in a separate file labeled "kids" for later deletion from his computer. Defendant also testified that, in his opinion, many of the images he downloaded were "not pictures of real children" because "it is not possible to get children to do this." Defendant did not "believe this could possibly be a real child, because no real child would allow this to be done to him or her." Defendant stated, as well, that "if an image is not that of a real child, then you haven't done anything to a child. You haven't endangered a child."
On cross-examination, defendant testified that he subscribed to and posted material on the website alt.binaries.pictures.erotica.preteen, along with several similar websites. According to defendant, those websites were "a lot of hype" because the images conveyed "were not pictures of children, [but rather] they were labeled as such in order to attract the sort of traffic that the news group wanted." Thus, defendant asserted, the images were either of young-looking adults, or of "dolls." Defendant insisted that, because "dolls are not children," there was nothing wrong with viewing images of "simulated kids" or "dolls" "engaged in various prohibited sexual acts or simulated acts."
*1113 On redirect examination, defendant testified that the images he posted to the website alt.binaries.pictures.erotica.preteen were of adults, not children. Defendant then referred to the prosecutor's question to him on cross-examination whether "it was okay to look at pictures of dolls or any pictures that weren't those of... real children or real people" engaging in sexual acts, responding: "And yes, I believe that that is not within the area of... prohibited pictures. It may be perverted... but that is not against the statute[,]" i.e., N.J.S.A. 2C:24-4b(5)(a) and (b).

II
If possible without frustrating the Legislature's basic design, we are obliged to construe the statutory provisions at issue here in a manner that saves them from invalidity on constitutional grounds. See Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 280, 716 A.2d 1137, 1149-50 (1998), cert. denied, 527 U.S. 1021, 119 S.Ct. 2365, 144 L.Ed.2d 770 (1999). Thus, in the light of Ashcroft v. Free Speech Coalition, supra, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403, we must view the pertinent terms of N.J.S.A. 2C:24-4b(5)(a) and (b) to encompass distribution and possession of only that child pornography which depicts real children, categories of activity that are considerably narrower than encompassed in the definitional provisions of the federal CPPA declared invalid by the United States Supreme Court. It follows that defendant's basic challenge to the constitutionality of the statute must fail. There is no similarity, for constitutional-evaluation purposes, between the pertinent provisions of N.J.S.A. 2C:24-4b(5)(a) and (b) as so construed and the statutory language of the federal CPPA invalidated in Free Speech Coalition.
Passing over the substantive contentions of unconstitutionality, we conclude that the trial judge erred in guiding the jury to a proper understanding of our statute as validly construed and applied. Manifestly, in the light of Free Speech Coalition, N.J.S.A. 2C:24-4b(5)(a) and (b) may not be interpreted to apply to images comprised of virtual child pornography or pornography involving young-looking adults. Nevertheless, the prosecutor argued in summation for such an interpretation, contending essentially that those provisions apply to "computer-generated" images of virtual children. Immediately after the summation, following a sidebar conference, the trial judge, however, delivered a corrective instruction, charging the jury that the State contended that the images at issue were of "real children" and that "it will not be an issue for you with respect to whether or not the statute is violated if there are computer-generated images transmitted."
The State contends that the result was that the jury was essentially instructed both that N.J.S.A. 2C:24-4b(5)(a) and (b) apply only to real children and that the State must be taken to have contended that the fifty-eight disputed images entered into evidence were of real children. Thus, the argument continues, as applied in this case, N.J.S.A. 2C:24-4b(5)(a) and (b) concerned alleged child pornography involving real children and not virtual children or young-looking adults; and defendant was prosecuted for possessing and distributing images of real children. As we view the record, however, defendant was unduly limited in defending against the charges.

A.
The factual and procedural particulars are critical. Prior to trial, defendant announced to the court that he intended to argue in his defense that the fifty-eight disputed images seized on his computer *1114 were not those of "actual" children. During cross-examination of one of the State's experts, Domres, defendant elicited testimony that Domres had made no determination whether the disputed images were "actual photographs" or "computer-generated images." During cross-examination of the other State's expert, Wolf, defendant elicited testimony that all of the disputed images could have been "morphed" or "computer generated," even though Wolf did not believe that all of them had been so produced. On recross-examination, Wolf testified that he could not say that none of the disputed images were computer generated. Nor was he able to tell whether an image was of an "actual child" or a computer-generated image, and he was not aware of any method of making such a distinction. Additionally, Wolf agreed that, if an image is computer generated, "[n]o actual child was photographed."
Testifying in his own defense, defendant stated that many of the images he downloaded were not of real children, but were, instead, images of "dolls," virtual children, or young-looking adults. In his closing argument, defendant made similar assertions, contending that the images were not of "actual children," but rather "they were computer-generated images, or they were well-constructed dolls," or persons older than sixteen years of age.
In her closing argument, the prosecutor addressed defendant's contention that the pictures were computer-generated images of virtual children, arguing that, because Hollywood cannot make believable computer-generated images of human beings, the images introduced into evidence must have been of real children. Continuing, the prosecutor argued:
And that's the same thing that we have here. Computer-generated images of human beings, they are not there. You won't find them. And these are not those types of images.
These are real children, ladies and gentlemen. And I submit to you on that count that [defendant's] take on the statute would be wrong even if they were computer-generated. Even if it was possible. Because the statute indicates reconstruction or reproduction showing a child. And that I submit to you covers those types of situations.
Following summations, the trial judge inquired about the prosecutor's statement during summation that N.J.S.A. 2C:24-4b(5)(a) and (b) covered computer-generated images of virtual children, asking whether this was the proper case to address that issue. The prosecutor replied that she thought she had argued forcefully that these were not such images. The court then indicated that it would clear up the matter by instructing the jury that, despite the prosecutor's summation statement, the State did not contend that defendant should be found guilty if the disputed images were computer generated, but only if the images were of real children.
At this juncture, defendant inquired, "[t]hen, are you also going to instruct the jury that if they believe that these pictures are computer-generated, that they cannot find the defendant guilty, or they must find him innocent?" The judge declined to give such an additional instruction, stating that:
I suppose it follows that I should give that instruction. I don't think that is the law.... I am not going to give an instruction on something that I think is an incorrect statement of the law, but I will try to make it clear that the issue here is whether these are images of real children.
Thereafter, the judge instructed the jury:
I just wanted to clear up one aspect of the State's summation to you just a few *1115 minutes ago. [The prosecutor] did say somewhere in the summation, I believe somewhere in the middle, something about the statute applying to computergenerated images. And I want to make clear to you that the State does not contend in this case that the defendant... violated the statute by transmitting any computer-generated images or possessing or viewing any computer-generated images. The State's contention is that these are images of real children contained in the exhibits, and that the violation of the statute has occurred because these are photographs or images of real children that have been possessed and viewed and transmitted or published by defendant.... So it will not be an issue for you with respect to whether or not the statute is violated if there are computer-generated images transmitted. You should rely on what the State contends here with respect to what its case is; in other words, that these are real children. And the defendant contends that the images are not of real children. So that is the issue that you will have to decide tomorrow when you come back to hear my final instructions.
In delivering his charge to the jury on the following day, the judge instructed: "[Defendant] contends that the State has offered no proof that the images submitted in evidence were of real people." This was the court's only reference to defendant's contention that the disputed images were of virtual children. We hold that, in instructing the jury on the elements of the crimes charged, the court did not adequately distinguish between images of real children and virtual images or focus sufficiently on the State's proof responsibilities in that regard.

B.
There is much merit in defendant's argument that the trial court erred when it declined to instruct "the jury on what to do if it found insufficient evidence to support the State's contention that the children in the images were real." Defendant asserts that, given the court's instruction, the jury could have viewed his virtual-image defense as "irrelevant under the law and therefore not worth considering," or it could have "agreed with the defense but nevertheless felt compelled to find [defendant] guilty."
By initially instructing the jury that "it will not be an issue for you with respect to whether or not the statute is violated if there are computer-generated images transmitted," the court appears to have removed the issue of computer-generated images from the case, unduly minimizing, if not entirely vitiating, the impact of defendant's virtual-image defense. In the circumstances, the jury would have been justified in regarding the virtual-image defense to be irrelevant, an eventuality that cannot be tolerated in the face of the Supreme Court's holding in Free Speech Coalition.
A burden of proof problem was also created by the trial court's instructions. Defendant contends that the State failed to prove its case. A line of federal court cases emerging since the Supreme Court's decision in Free Speech Coalition interpreting similar provisions of the CPPA indicates that, where a defendant asserts that the disputed images entered into evidence on the prosecution's proffer are of virtual children, the prosecution bears the burden of proving beyond a reasonable doubt that the images were of real children. See United States v. Sims, 220 F.Supp.2d 1222, 1226 (D.N.M.2002) (holding, in the light of Free Speech Coalition, that the same court had "previously erred by ruling that the government did not have the burden of proving beyond a reasonable doubt that the visual depictions at issue *1116 involved real children"); United States v. Oakes, 224 F.Supp.2d 296, 301-02 (D.Me. 2002) (observing in the light of Free Speech Coalition that, in a trial, the prosecution bears the burden of proving that defendant possessed images of "real children"); see also United States v. Reilly, 2002 WL 31307170, at *6 (S.D.N.Y. October 15, 2002) (holding, in the light of United States v. X-Citement Video, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), and Free Speech Coalition that, to support a criminal conviction, "a defendant in possession of materials containing visual depictions of real minors engaging in sexually explicit conduct must know that real minors were the subject of the visual depictions"); United States v. Marcus, 239 F.Supp.2d 277, 283 (E.D.N.Y.2003) (same); accord United States v. Pabon-Cruz, 255 F.Supp.2d 200, 204-08 (S.D.N.Y.2003); People v. Alexander, 204 Ill.2d 472, 274 Ill.Dec. 414, 791 N.E.2d 506, 515 (2003); but see United States v. Kimler, 335 F.3d 1132, 2003 WL 21519916, at *6-*8 (10th Cir.2003) (holding that the proof need not be based on expert opinion).
The trial court herein did not instruct the jury with sufficient particularity on the State's burden of proof when faced with a virtual-image defense. Specifically, the court did not instruct the jury that the State bore the burden of proving beyond a reasonable doubt that the images on defendant's computer were of real children and that he knew the images were of real children.
The deficiency in the foreshortened instructions that were given is especially critical in the face of the testimony from the State's expert, Wolf, that all of the images could have been computer-generated virtual children and that he could not tell the difference between an image of a real child and that of a virtual child. That testimony is a far cry from a discharge of the State's burden to prove that the images were of real children and that defendant knew they were of real children. And, it rendered as effectively unsupported by the evidence the prosecutor's assertion in summation that because Hollywood cannot make believable computer-generated images of human beings, the images before the jury must, perforce, have been of real children.
The absence of more precise instructions concerning the State's burden of proof, especially in the light of Wolf's testimony, denied defendant a fair trial. It may well be, if the State cannot produce better evidence than it proffered at trial, that it cannot prevail given the burden of proof it must shoulder. We will not dismiss the charges, however. Because the rules of law affecting the matter have been in flux and development since the charges were filed, the State should have an opportunity to reorder its proofs to meet the substantive standards so recently clarified definitively.
We reach this conclusion at least in part on plain error grounds; defendant did not object specifically to the court's instruction on the burden of proof. See R. 1:7-2; R. 2:10-2. Under the plain error rubric, an error should not be disregarded on appeal if it was clearly capable of producing an unjust result. See R. 2:10-2. The omissive error in the instruction to the jury concerning the State's burden of proof, as well as the commissive error in the instruction that it was not an issue for the jury whether N.J.S.A. 2C:24-4b(5)(a) and (b) could be violated through the use of computer-generated images, were in combination, if not each separately, clearly capable of producing an unjust result because the jury was not as well-informed, specifically, as it should have been on the elements the State was required to prove and the standard of proof which governed. Accordingly, the judgment of conviction *1117 must be reversed on this basis and the matter remanded for retrial with more comprehensive jury instructions reflecting the effect of Free Speech Coalition on the prosecution's proof obligations in the face of defendant's virtual-image defense.

III
With this disposition, we need not address separately either defendant's challenge to the trial court's denial of his motion for acquittal at the close of the State's case, or his appeal from the trial court's ruling declining to downgrade the seconddegree crime to third-degree status for sentencing purposes pursuant to N.J.S.A. 2C:44-1f(2); and we shall not do so. Although the other sentencing issue is also moot in the light of our disposition, we note the State has conceded that the order subjecting defendant to sex offender registration requirements was erroneous because the statutes under which defendant was convicted are not predicate provisions in N.J.S.A. 2C:7-2b(2). Even though we are not required, either, to address the issues raised regarding proof of the age of the children depicted in the material admitted in evidence against defendant, we shall do so in order to provide guidance to the trial court on remand in the likely event those questions arise again.

IV
Defendant argues that "[b]y permitting the State to prove that a person depicted in an image was a child without submitting evidence of actual age, N.J.S.A. 2C:24-4b(6) unconstitutionally shifts the burden to defendants to prove that the materials they possessed do not depict children." The trial judge wisely eschewed an instruction on the statutory presumption, but the instruction he did give to the jury regarding the determination of the ages of those depicted should have been accompanied by other steps designed to address this problem of proof more comprehensively.
At the time of trial, N.J.S.A. 2C:24-4b(6) in its entirety provided: "For purposes of this subsection, a person who is depicted as or presents the appearance of being under the age of 16 in any photograph or film shall be rebuttably presumed to be under the age of 16." At trial, the State attempted to have Detective Wolf testify that, in his expert opinion, the fifty-eight images seized from defendant's computer were of "children in sexually explicit poses or in sexual activities." The court excluded that testimony because Wolf had not "been qualified as an expert in determining... age...."
At that juncture, defendant objected, arguing essentially that, because the State had to prove that the images were of persons under the age of sixteen and because Wolf could not offer such testimony, an essential basis for the child-pornography charges against him was lacking. In response to a question from the court, the prosecutor stated that she was not going to present an expert witness to opine that the persons depicted in the images were children. Instead, the prosecutor stated that "[t]he pictures speak for themselves."
The court then instructed the jury that:
I am going to strike from the record the detective's last answer to the question that was asked about his opinion regarding children being depicted in the pictures; in particular, any pictures that haven't been shown to you.
First of all, you should rely on the evidence that is actually presented to you, and there were some 58, I think, pictures shown to you over the last hour or so. But this detective has not been qualified by me as an expert in determining the age of the people who are depicted. And ultimately it will be your *1118 decision regarding the age of the people depicted.
I will tell you right now that under the law, under the statute that I will instruct you on at the end of the case, the relevant age is 16. That is, in order to meet the statutory requirements for depiction of minors, the person who is depicted must be less than 16 years old. So you should disregard the detective's opinion about how old anybody is and reach your own conclusions regarding the evidence that has been presented.
Subsequently, at a charge conference, the prosecutor requested that the jury be instructed in accordance with the "presumption" language of N.J.S.A. 2C:24-4b(6) concerning the ages of the persons depicted in the fifty-eight images. The judge indicated that he would instruct the jury on the issue, but not in terms of a "presumption" because such an instruction would run afoul of the limitations articulated in N.J.R.E. 303.
Defendant then argued that, if the jury was permitted to determine the ages of the persons in the images based only on the jurors' perceptions and impressions, the State would be relieved of the burden of proving the essential element that those persons were under sixteen years of age. The judge rejected defendant's argument, reasoning that use of the images themselves was an acceptable alternative means to the use of expert opinion for the State to prove the ages of the persons depicted.
Later, at another charge conference, defendant objected to the proposed instruction concerning proof of the ages of the persons depicted in the images that had been received in evidence. The proposed instruction recited that the State had to prove beyond a reasonable doubt that those persons were under sixteen years of age, and it also informed the jurors that they could base their findings on that issue on their own perceptions of the images themselves. Defendant argued that these two statements were "directly contradictory." The judge disagreed, indicating again that the images themselves provided an alternative means for the State to prove the ages of the persons depicted.
Subsequently, defendant objected to the prosecutor's summation statement that the State was not required to prove the birthdate of each person depicted in the fiftyeight images. The judge overruled defendant's objection, indicating that N.J.S.A. 2C:24-4b(6) implicitly provided that such specificity in proof of age was not required.
In his charge to the jury, the judge stated:
The use of the word "child" in this statute [N.J.S.A. 2C:24-4b] means any person under 16 years of age. The State must prove beyond a reasonable doubt that the child in any particular photograph or reproduction or reconstruction was under 16 years of age at the time of the prohibited sexual act.
If you determine that a person who is depicted appears to be under the age of 16 or is depicted as being under 16, then you may, but you are not required to, regard the appearance of the person as sufficient evidence of the person being less than 16 years old.
You should remember, however, that the State bears the burden of proving beyond a reasonable doubt based on all the evidence that the person depicted is less than 16 years old.
Defendant asserts that the instruction "pursuant to N.J.S.A. 2C:24-4b(6)" shifted to defendant the burden "to prove that he... did not possess or distribute images of children," with the result that defendant "was convicted despite no proof ever having been submitted to the jury as to actual age[s]" of the persons depicted in the fiftyeight images.
*1119 On the record before us and in the light of the arguments advanced by the parties, we reject the argument that expert testimony was necessarily required to prove the ages of the children depicted in the images at issue. The trial judge correctly avoided the pitfalls of charging the jury in accordance with the presumption established in N.J.S.A. 2C:24-4b(6). And, at no point in the instructions that were given did the court shift the burden of proof on the issue of age from the State to defendant. Indeed, the instructions given stated with clarity that the State bore the burden of proving the ages of those depicted as well as the other issues in the case.
Moreover, though the State did not provide direct proof of the birthdates of the persons depicted in the images, as defendant unsuccessfully proposed it should, the State did present evidence to the jury to prove the ages of those depicted. That evidence consisted of the fifty-eight images proffered and received in evidence.
We are mindful that proof of a person's age by his or her appearance alone is a questionable practice. See State v. Koettgen, 89 N.J.L. 678, 683, 99 A. 400, 402 (E. & A.1916) (observing that "[i]t is a matter of common knowledge, derived from observation and experience, that there is nothing more uncertain and highly speculative than that of attempting to fix the age of a person by his or her appearance"); Laurino v. State Div. of Alcoholic Bev. Control, 81 N.J.Super. 220, 226, 195 A.2d 306, 309 (App.Div.1963) (noting that "determining the age of a person by his appearance is most often very speculative"). In the instant matter, even the State's witness, Detective Wolf, remarked that "it really takes an expert, usually a pediatrician" to determine a child's age from the images presented in a child-pornography case.
Notwithstanding the potential pitfalls, we are constrained to observe that, in particular circumstances, determinations of an age threshold based on outward appearance alone can be seen to be as valid an exercise of common knowledge as of expert opinion. Whether or not a person is older or younger than sixteen years of age may well be easier to determine than a precise age. We cannot conclude that such evaluations are always, in the terms of the standard test, "beyond the ken of the average juror[,]" DeHanes v. Rothman, 158 N.J. 90, 100, 727 A.2d 8, 13 (1999), or that experts are invariably better equipped than laypersons are to make the judgment based on appearance alone.
"Like any other fact, age is, of course, for the determination of the jury." State v. Carlone, 109 N.J.L. 208, 211, 160 A. 551, 552 (Sup.Ct.1932). "[W]hether the age of a model in a child pornography prosecution can be determined by a lay jury without the assistance of expert testimony... must be determined on a case by case basis." United States v. Katz, 178 F.3d 368, 373 (5th Cir.1999). If the disputed images in such a case depict either very young child-models or older "models of sufficient maturity," expert testimony will not be required because a layperson can plainly make the determination whether the person so depicted is younger than sixteen. Ibid. However, when the persons depicted in the images approach sixteen years of age, "expert testimony may well be necessary to `assist the trier of fact to understand the evidence or to determine a fact in issue.'" Ibid. (quoting Fed.R.Evid. 702). See United States v. Fox, 248 F.3d 394, 409 (5th Cir.2001), vacated on other grounds, 535 U.S. 1014, 122 S.Ct. 1602, 152 L.Ed.2d 617 (2002) (upholding admission of photographs into evidence without expert testimony as to age of the young persons depicted); see also United States v. Riccardi, 258 F.Supp.2d 1212, 1218 (D.Kan. 2003).
*1120 We adopt the rationale of these federal cases, including the implicit requirement that the trial court must examine each image to be presented to the jury in order to make discrete assessments, in discharge of its gatekeeping functions, which of the images can be evaluated by the jury on a common-knowledge basis and which require expert testimony to assist the jury in determining whether the person depicted is older or younger than sixteen years of age. See Riccardi, supra, 258 F.Supp.2d at 1219; see also United States v. Nelson, 38 Fed.Appx. 386, 392 (9th Cir.2002) ("There is no requirement that expert testimony be presented in child pornography cases to establish the age of children in the pictures."); State v. Roberts, 796 So.2d 779, 784-85 (La.App. 2001)(state law permits trier of fact to evaluate the age of an individual displayed or depicted in an offensive image). Moreover, we emphasize that, irrespective of how the State chooses to prove the age element, when the trial court addresses the age issue in its instructions to the jury, the judge must specifically instruct the jury that the State bears the burden of proving beyond a reasonable doubt that the person depicted in each image to be used as a basis for conviction is less than sixteen years of age. The judge must charge the jury that speculation about age is not permitted, but rather that the jury must be persuaded by the evidence that, in each instance, the sixteen-year age threshold has been proven.

V
The final question which must be addressed is whether the trial court erred in denying defendant's motion to dismiss the indictment based on a violation of his constitutional right to a speedy trial, by reason of a "delay of more than two and onehalf years in bringing defendant to trial[.]" "The Sixth Amendment protects a defendant's right to a speedy trial after arrest or indictment." State v. Long, 119 N.J. 439, 469, 575 A.2d 435, 449 (1990). In Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972), the United States Supreme Court "formulated a four-part test to analyze a defendant's sixth-amendment speedy trial claim. The enumerated factors are: (1) the length of the delay, (2) the reasons for the delay, (3) whether and how defendant asserted his speedy trial right, and (4) the amount of prejudice to defendant caused by the delay." Long, supra, 119 N.J. at 470, 575 A.2d at 450.
On March 6, 2001, defendant moved to dismiss the indictment, alleging that he had been waiting two and one-half years since his arrest to be tried on the charges against him and that the delay constituted a denial of his right to a speedy trial. After hearing argument, the judge issued a comprehensive oral decision in which he applied the Barker test to defendant's speedy-trial claim and determined that no constitutional violation had occurred. In denying defendant's motion, the judge held, in sum, that the delay had not been unreasonable given the unique circumstances of the case and that defendant had not been unduly prejudiced by that delay. There was no in error in this regard.
The judge first reviewed the chronology of the delay between defendant's arrest on October 27, 1998, and the anticipated trial date of May 7, 2001, dividing the time into discrete periods of delay which the court attributed to the State, defendant, or the court system. Defendant concedes that the judge's apportionment of times to the various periods is "reasonably accurate" and he "does not challenge the court's findings in this respect."
According to the judge, defendant was arrested on October 27, 1998, and was indicted on March 30, 1999, five days after the State Police "High Tech Unit" completed *1121 its examination of defendant's seized computer files. Defendant was to be arraigned on May 18, 1999, but his arraignment was delayed until July 23, 1999, so that his attorney could obtain a "computer expert." Shortly thereafter, defendant filed a suppression motion originally returnable on September 23, 1999, but which was delayed until October 18, 1999, because of the prosecutor's illness. To that date, about one year had passed since defendant's arrest.
The court contemplated a trial date in January 2000, but that plan was thwarted by the unavailability of State witnesses. Trial was then scheduled for March 13, 2000. However, shortly before that trial date, the State requested and received an adjournment because its computer expert at the time required treatment for cancer.
That expert was apparently back at work at some point during the summer of 2000, and the court attempted to schedule trial for the early fall months. However, the prosecutor had been assigned to a "three-defendant murder case" during that season, and was not available. Additionally, the court itself experienced "scheduling problems" in the later months of 2000, which prevented setting a trial date during that period. At this juncture, about two years had passed since defendant's arrest.
In late 2000, defendant moved to represent himself at trial and, on December 8, 2000, the court conducted a hearing and granted defendant's motion to proceed pro se. The court set a trial date of January 29, 2001.
At a status conference in early January 2001, the State revealed that its expert had had a relapse, required a lung transplant, and was also suffering from Parkinson's disease. The State requested an adjournment to obtain another computer expert. The court granted the request and scheduled trial for May 7, 2001, which was about thirty months after defendant's arrest and about twenty-five months after his indictment.
Also in early January 2001, defendant had stated that he was "ready for trial" and "wanted it to occur sooner rather than later." This was his first assertion of his right to a speedy trial.
Considering the first element of the four-part Barker test, the length of the delay, the judge determined that the twenty-five-month period between indictment and trial was a factor that, facially, weighed in defendant's favor. However, when the court addressed the second factor, the reasons for the twenty-five-month delay, it determined that the delay was not unreasonable.
Defendant contends that the multimonth delay attributable to the illness of the State's initial expert was not properly substantiated because there was no proof that he was an "essential" witness or that the State could not have replaced him in a more timely fashion. The judge concluded that, because it was difficult for the State to obtain computer experts, the sixto-ten-month delay occasioned by that illness was not unreasonable or inappropriate in the circumstances.
Defendant also attacks the judge's reasoning concerning the delays caused by the prosecutor's illness in the fall of 1999, the unavailability of State's witnesses in early 2000, and the prosecutor's scheduling problems because of the murder trial in the fall of 2000. The judge determined that these "five or so months of delays" were "purely attributable to the Prosecutor's Office," but were not unreasonable, either, in the extant circumstances.
Defendant contends that, because the five-month delay was in no part due to any action by him, it should inure to his benefit in any speedy-trial analysis. There is merit to the argument as framed, but it *1122 fails when considered against the remaining two Barker factors.
The third Barker factor bears upon "whether and how defendant asserted his speedy trial right." Long, supra, 119 N.J. at 470, 575 A.2d at 450. The judge acknowledged that defendant had done so in January 2001, but noted that this occurred "more than two years after the date of the initial arrest" in October 1998. Thus, defendant waited a long time before asserting his speedy-trial right, a circumstance weighing against any determination that the right was violated, especially in light of the fact that trial began only about four months after the first assertion of the speedy-trial right.
The last Barker factor concerns "the amount of prejudice to defendant caused by the delay." Ibid. The judge recognized that defendant had suffered the prejudice inherent in having "this kind of indictment hanging over his head for a period of some two and a half years," but determined that such prejudice was "not of sufficient weight to overcome the other factors in this case."
Defendant conceded at the hearing that the delay in his trial had not caused him prejudice through the "loss of witnesses" or evidence, and he conceded further that the only prejudice he had suffered was the "personal hardship" of having the crime "hanging over" him for the preceding two years. While the hardship on defendant ought not to be minimized, it is clear that the delay had no adverse impact on his ability to defend. Thus, we conclude the judge properly weighed the "prejudice" factor in the Barker analysis.
Defendant now contends that he suffered a "loss of memory" concerning the facts of his case because of the length of the delay, and that his ability to defend himself was impaired by that loss. Defendant failed to raise the issue of a possible loss of memory before the trial court on the motion or during trial, however. Therefore, we will not consider that argument. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142, 145 (1973) ("It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available `unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'").
The delay in defendant's trial date can be viewed as having benefitted him to some extent. It provided him with a virtual-image defense to the crimes charged against him which was not so clearly available at the time of arrest or indictment. That defense at trial in May 2001, emanated from the Ninth Circuit's decision in Free Speech Coalition, which came to be affirmed by the United States Supreme Court about one year after trial. The Ninth Circuit decision was handed down on December 17, 1999, more than one year after defendant was arrested and more than eight months after he was indicted. Around the time the Ninth Circuit rendered its decision, however, the Eleventh Circuit held that such a defense was not maintainable. See United States v. Acheson, 195 F.3d 645, 650-51 (11th Cir.1999). By the time of trial, the Fourth Circuit had also rejected it. See United States v. Mento, 231 F.3d 912, 920-21 (4th Cir. 2000), vacated, 535 U.S. 1014, 122 S.Ct. 1602, 152 L.Ed.2d 617 (2002).
Nevertheless, the first year of delay in defendant's trial effectively benefitted him by opening up an avenue of defense supported by some case law. That tangible benefit must be weighed against defendant's assertions of prejudice.
The trial court, did not err in its consideration and application of the four Barker factors in denying defendant's motion to *1123 dismiss the indictment on speedy-trial grounds. The trial court's rationale in evaluating the separate periods of delay and their practical effects was sound. The delay in bringing defendant to trial did not prejudice his ability to present a defense. Accordingly, we affirm the denial of defendant's motion to dismiss on speedy-trial grounds.

VI
Affirmed in part; reversed in part; remanded.